IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

COLORADO INTERSTATE
GAS COMPANY,

                                        Plaintiff,

        Vs.                                         No. 09-4031-SAC

THOMAS E. WRIGHT, et al.,

                                        Defendants.


MEMORANDUM AND ORDER

        The plaintiff, Colorado Interstate Gas Company ("CIG"), brings

this action seeking both declaratory and injunctive relief against the

commissioners and officials with the Kansas Corporation Commission

("KCC") in their official capacity.  Specifically, CIG seeks an order declaring

that the Kansas Gas Storage Statutes, K.S.A. §§ 55-1,115 and 55-182(a),

and the Kansas Gas Storage Regulations, §§ 82-3-105, 82-3-113, 82-3-

114, 82-3-117, 82-3-120, and 82-3-1000 through 82-3-1012, are pre-

empted by the Natural Gas Act, ("NGA") (15 U.S.C. §§ 717 *et seq.*) and by

the Pipeline Safety Act, ("PSA") (49 U.S.C. §§ 60101 *et seq.*), violate the

Supremacy Clause, are preempted by federal law, and have no force or

effect on the plaintiff.  CIG also asks for an order enjoining the defendants

from enforcing these statutes, regulations and rules against its

underground storage of natural gas in Kansas.

The case comes now before the court on the parties' cross-motions for summary. (Dks. 19 and 21). The parties have filed a joint stipulation of facts (Dk. 16) and therein represent "that upon acceptance of this stipulation there are no genuine issues of material fact remaining." (¶ 25). The parties, however, have not confined their presentations to these stipulations. Both sides have offered additional matters of public record and have argued competing inferences from them.

**JOINT STIPULATION OF FACTS (Dk. 16)**

The parties have stipulated to the following as facts to be received and considered as evidence without further proof. The court hereby sets out the joint stipulation:

1. Plaintiff, CIG, is a general partnership organized and existing under the laws of the State of Delaware with its principal place of business located at 2 North Nevada Avenue, Colorado Springs, Colorado 80903. CIG is authorized and is in good standing to conduct business in the State of Kansas. CIG is an interstate natural gas pipeline company that owns and operates interstate natural gas pipeline facilities and is engaged in the transportation and storage of natural gas in interstate commerce in several

states, including Kansas.

2.  Defendant, Thomas E. Wright, is a Commissioner and the Chairman of the Kansas Corporation Commission ("KCC") and is a resident of the State of Kansas.

3.  Defendant, Joseph F. Harkins, is a Commissioner of the KCC and is a resident of the State of Kansas.

4.  Defendant, Michael C. Moffet, is a Commissioner of the KCC and is a resident of the State of Kansas.

5.  Defendant, Douglas Louis, is the Director of the KCC Conservation Division and is a resident of the State of Kansas.

6.  Defendant, Daniel Fredlund, is the Manager of the KCC Underground Porosity Gas Storage Section and is a resident of the State of Kansas.

7.  CIG is subject to federal jurisdiction and regulation by the Federal Energy Regulatory Commission ("FERC") under the Natural Gas Act ("NGA," 15 U.S.C. §§ 717-717w).   On June 5, 1945, the Federal Power Commission ("FPC")[1] issued CIG a Certificate of Public Convenience and

---

[1]The Federal Power Commission's authority and responsibilities have been transferred to the Federal Energy Regulatory Commission.  *See* 42 U.S.C. § 7172.

Necessity under the NGA, finding CIG to be ". . . engaged in the transportation of natural gas in interstate commerce and . . . is a 'natural - gas company' within the meaning of the Natural Gas Act;" *See* Docket No G-294, 4 F.P.C. 936, 1945 WL 1027 (F.P.C.).

8.  On August 29, 1973, the FPC issued CIG a Certificate of Public Convenience and Necessity under the NGA, authorizing CIG to acquire, construct, operate and maintain the Boehm Gas Field in Morton County, Kansas, as underground gas storage reservoir.  *See* Docket No. CP73-237, 50 F.P.C. 588, 1973 WL 12933 (F.P.C.).

9.  CIG's Boehm Gas Storage Field is a depleted oil and natural gas field.

10.  CIG's Boehm Gas Storage Field is an underground porosity gas storage facility.  Gas stored by CIG in the Boehm Gas Storage Facility is stored in interconnected pores in rock and not in a salt cavern.

11.  CIG employs three types of wells at its Boehm Gas Storage Facility:  Injection/Withdrawal (I / W) wells, observation wells and saltwater disposal wells.  In the injection phase, pipeline quality natural gas is moved from CIG's interstate mainline pipeline through flowlines to one or more I / W wells.  The gas moves from the mainline pipeline to the I / W wells either

through the pressure CIG maintains in the pipeline or through supplemental compression provided by gas compressors located at the Boehm Gas Storage Facility. The I / W wells move the gas through well casing or tubing from the wellhead at the ground surface to the geological formation in which the gas is stored until it is needed. In the withdrawal mode, the I / W wells are used to move the gas from the storage formation to the wellhead. Observation wells are used to monitor the gas in the gas storage reservoir. Saltwater disposal wells are utilized to dispose of water produced during gas storage operations.

12. The wells CIG operates at its Boehm Gas Storage Facility consist of various combinations of wellbores, subsurface metal pipe held in place by cement, wellheads, pumps, valves, flow lines and associated equipment allowing gas to move from the surface to the subsurface storage reservoir and connecting the wells to CIG's natural gas pipeline that transports the gas to and from the storage facility.

13. The wells and the underground storage reservoir used by CIG at Boehm Field are not inspected by FERC.

14. The Kansas statute and KCC regulations at issue in this case were enacted and adopted in 2001, in direct response to an incident in

January 2001, at Hutchinson, Kansas, involving underground storage of natural gas.

15.  In January 2001, natural gas, which was being stored by a wholly-owned subsidiary of ONEOK, Inc., Mid-Continent Market Center, Inc. ("Mid-Continent"), in underground salt caverns, escaped and migrated through a porous underground geologic formation.  The escaped gas surfaced through abandoned wells, causing two explosions in Hutchison, Kansas.  The first explosion destroyed two businesses and damaged several other businesses.  The second explosion destroyed a mobile home, killing two people.

16.  At the time of the January 2001 incident, Mid-Continent provided interstate natural gas service pursuant to a certificate issued by FERC, exempting Mid-Continent from the requirements of the NGA under the Hinshaw exemption.  Docket No. CP95-684-000, 72 F.E.R.C. 62274, 1995 WL 562483 (F.E.R.C.) (1995).  The FERC Order issuing the certificate states that Mid-Continent "meets the qualifications for a Hinshaw exemption under Sec. 1(c) of the NGA because all the gas received from interstate pipelines is received within the state of Kansas, consumed within the state of Kansas, and all transactions involving the gas are regulated by

the KCC." *Id.*

17. At the time of the incident, certain aspects of Mid-Continent's use of the underground salt caverns were subject to the jurisdiction of the Kansas Department of Health and Environmnet ("KDHE").

18. Mid-Continent has never been associated with CIG, CIG's parent corporation, El Paso Corporation, or any of CIG's affiliates.

19. After the incident at Hutchinson, Kansas, the Kansas Legislature held hearings from February 2001 through March 2001, to examine the safety and the level of safety regulation governing the storage of natural gas in underground salt caverns and in underground porosity fields.

20. In May 2001, the Kansas Legislature concluded that increased safety regulation of natural gas storage in both salt caverns and porosity fields was necessary. H.B. 2200 was passed by the Kansas Legislature, was enacted into law, and is codified at K.S.A. 55-1,115 *et seq.*

21. In H.B. 2200, the Kansas Legislature, among other things, vested jurisdiction for the safety of underground porosity storage of natural gas with the KCC, and vested jurisdiction for the safety of underground storage of natural gas in salt caverns with the KDHE. Both the KCC and the KDHE were directed to adopt regulations that would protect the public

safety by regulating and ensuring the safety of underground storage in natural gas in Kansas.

22.  In 2002, the KCC, in accordance with its Legislative mandate, and its duty to further the will of the Legislature, held hearings and adopted regulations designed to enhance the public safety through the regulation of underground porosity storage of natural gas in Kansas.  These regulations are codified at K.A.R. 82-3-1000 through 82-3-1012.

23.  The KCC has implemented and commenced enforcement of the regulations codified at K.A.R. 82-3-1000 through 82-3-1012, and applied those regulations to all those storing gas in underground porosity fields, including CIG, which stores natural gas in its Boehm Gas Storage Facility in Morton County, Kansas.

24.  CIG's failure to comply with the KCC's regulations would subject CIG to the remedies available at Kansas law.

25.  It is hereby stipulated by and between Plaintiff and all Defendants that upon acceptance of this stipulation there are no genuine issues of material fact remaining.

**SUMMARY JUDGMENT PROCEDURE**

A court grants a motion for summary judgment under Rule 56 of

the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will . . . preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Where, as here, the parties file cross motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *James Barlow Family Ltd. Partnership v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997), *cert. denied*, 523 U.S. 1048 (1998).

As reflected in the scheduling order, the parties agreed the case could be "resolved by summary judgment" and that "the court may, if

9

appropriate, grant summary judgment to either party based on the joint stipulation of facts and based on cross-motions for summary judgment." (Dk. 17, p. 1). As the stipulation at ¶ 25 reiterates, the parties agree that the court's acceptance of these stipulations means there are no genuine issues of material fact remaining. In briefing the issues, both sides offered matters outside the scope of the joint stipulation. The defendants complained first and moved the court for leave to file a sur-reply brief instanter. (Dk. 24.) The plaintiffs have filed a response to the defendant's motion. (Dk. 25). The court grants the defendant's motion for leave and considers the arguments and issues addressed in that filing and the plaintiff's later response.[2]

In having agreed that summary judgment is appropriate on the stipulations and arguments submitted in their briefs, the parties have established the factual and legal parameters to this summary judgment

_____

[2]Both sides relied upon and submitted materials not referenced in the joint stipulation. The additional materials are of similar character and quality and appear to be self-authenticating official publications accessible from the public record either from official government websites or Westlaw. The defendants' complaints of prejudice are hollow, for they essentially opened the door by introducing comparable materials and by offering arguments that invited the use of these documents. The court considers any claim of prejudice to have been cured with the filing of the sur-reply brief.

ruling.  The court would be remiss if it did not observe that this suit and the briefing appear to have been fashioned to have the pre-emption issue decided without an established connection to a specific regulatory event. Both sides appear to seek a general opinion on whether any and all efforts by the KCC to apply and enforce the state statutes and regulations on underground storage of natural gas that is in interstate commerce have been pre-empted by the NGA, the PSA, or both.  Rather than serving as some repository of advisory judicial opinions, the court will focus its analysis on the narrowest legal issues that have been briefed.  Additionally, the parties' briefing on the regulatory atmosphere surrounding underground storage of natural gas raises more questions than anything else.  For all these reasons, the court offers the caveat that anyone reading and applying this decision should be mindful that the analysis and holding here necessarily depend upon what the parties have presented and characterized.  Simply put, the court has looked exclusively to the parties' filings for its findings and the characterization of the regulatory efforts involved here.

**GENERAL FEDERAL PREEMPTION PRINCIPLES**

By reason of the Supremacy Clause of Article VI of the

Constitution, Congress has the power to preempt or supersede state laws that interfere with, conflict with, or are contrary to federal law. *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 712 (1985). Such state laws are regarded as "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). "Determining whether Congress has exercised its power under this clause to preempt state law requires an examination of congressional intent." *Panhandle Eastern Pipeline Co. v. State of Oklahoma*, 83 F.3d 1219, 1225 (10th Cir. 1996) (citing *Northwest Cent. Pipeline v. Kansas Corp. Comm'n*, 489 U.S. 493, 509 (1989)). A court's "inquiry into the scope of a statute's pre-emptive effect is guided by the rule that "'[t]he purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Altria Group, Inc. v. Good*, ---U.S.---, 129 S. Ct. 538, 543 (2008) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

The Supreme Court has recognized that Congress may signal its pre-emptive intent either in the explicit language of the statute (express pre-emption) or in the "structure and purpose" of the statute (implied pre-emption). *Altria Group, Inc.*, 129 S. Ct. at 543. When there is an explicit pre-emption clause, the court narrows its inquiry to "the substance and scope of Congress' displacement of state law." *Id.* With implied pre-

emption, courts consider inferring pre-emptive intent from whether Congress intended to occupy the legislative field (field pre-emption) or from whether the state law actually conflicts with federal law (conflict pre-emption). *Id.*

With field pre-emption, a "state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." *English v. General Electric Co.*, 496 U.S. 72, 79 (1990). A court may infer this intent "where the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where 'the object sought to be obtained by the federal law and the character of the obligations imposed by it . . . reveal the same purpose.'" *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Conflict pre-emption recognizes that "even where Congress has not entirely displaced state regulation in a particular field, state law is pre-empted when it actually conflicts with federal law." *Id.* This latter pre-emption "occurs where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress." *Ramsey Winch Inc. v. Henry*, 555 F.3d 1199, 1204 (10th Cir. 2009) (citation omitted).

Several general rules will guide the court's pre-emption analysis. There is an assumption that unless Congress' intent is clear and manifest, a federal act does not supersede the states' historic police powers, particularly in a "field traditionally occupied by the states." *Altria Group, Inc.*, 129 S. Ct. at 543. However, this "'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000) (citations omitted). The rules of statutory construction are important in discerning congressional intent:

> In determining whether a statute expressly or implicitly preempts state law, we look to the principles of statutory construction. "We review a district court's statutory interpretation de novo," and "[i]t is our primary task in interpreting statutes to determine congressional intent, using traditional tools of statutory construction." *United States v. Manning*, 526 F.3d 611, 614 (10th Cir.2008) (internal quotation marks and citations omitted), *cert. dismissed*, 2008 WL 4656882 [129 S. Ct. 780] (Dec. 19, 2008). In ascertaining such congressional intent, "[w]e begin by examining the statute's plain language," and "[i]f the statutory language is clear, our analysis ordinarily ends." *Id*. . . . "If the statute's plain language is ambiguous as to Congressional intent, we look to the legislative history and the underlying public policy of the statute." *Manning*, 526 F.3d at 614 (internal quotation marks and citation omitted).

*Russell v. United States*, 551 F.3d 1174, 1178 (10th Cir. 2008), *cert. denied*, 130 S. Ct. 95 (2009).  Federal regulations have the same "pre-emptive effect" as federal statutes if promulgated pursuant to the discretion and within the authority given by Congress.  *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984).  Federal regulations also are "indicative" of what powers Congress intended for an agency to exercise and of the parameters of the occupied regulatory field.  *Schneidewind v. ANR Pipeline Co.*, 485 U.S. at 309 n. 12.

## ANALYSIS

The scope of the NGA is fairly established and beyond much dispute.  The Supreme Court has said:

> The NGA long has been recognized as a "comprehensive scheme of federal regulation of 'all wholesales of natural gas in interstate commerce.'"  *Northern Natural Gas Co. v. State Corporation Comm'n of Kansas*, 372 U.S. 84, 91, 83 S.Ct. 646, 650-51, 9 L.Ed.2d 601 (1963), quoting *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 682, 74 S.Ct. 794, 799, 98 L.Ed. 1035 (1954).  The NGA confers upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale.  *Northern Natural Gas Co.*, 372 U.S., at 89, 83 S.Ct., at 649.

*Schneidewind v. ANR Pipeline Co.*, 485 U.S. at 300-301 (underlining added and footnote omitted).  In understanding these sweeping jurisdictional statements, it is helpful to consider the backdrop to the NGA:

The NGA was enacted in 1938, after a series of Commerce Clause cases striking down state laws "left the states powerless to regulate interstate transportation and wholesales" of natural gas. *Cascade Natural Gas Corp. v. FERC*, 955 F.2d 1412, 1416 (10th Cir. 1992). The NGA was enacted to fill this void. "[W]ithout supplanting any of the existing authority of the state agencies, the Act was intended to provide a powerful regulatory partner, the Federal Power Commission [now the Federal Energy Regulatory Commission], which could regulate activities where the state bodies could not." *Corporation Comm'n v. FPC*, 415 U.S. 961, 962 (1974) (Rehnquist, J., dissenting from summary affirmation). The NGA delineated specific areas of federal regulatory authority. "Section 1(b) of the NGA gave the [Federal Energy Regulatory] Commission plenary jurisdiction over three areas, and three areas only: (1) the 'transportation of natural gas in interstate commerce,' (2) the 'sale in interstate commerce of natural gas for resale,' and (3) 'natural-gas companies engaged in such transportation or sale.'" *Cascade*, 955 F.2d at 1416 (quoting 15 U.S.C. § 717(b)). On the other hand, "among the powers ... reserved to the States is the power to regulate the physical production and gathering of natural gas in the interests of conservation or any other consideration of legitimate local concern." *Interstate Natural Gas Co. v. FPC*, 331 U.S. 682, 690 (1947).

*Panhandle Eastern Pipeline Co. v. State of Oklahoma,* 83 F.3d at 1225-26.

It's important to recognize that even before the NGA, the states' regulatory reach did not extend to interstate <u>transportation</u> of natural gas. *Michigan Consol. Gas Co. v. Panhandle Eastern Pipe Line Co.*, 887 F.2d 1295, 1301 (6th Cir. 1989), *cert. denied*, 494 U.S. 1079 (1990).

Thus, in the NGA, "Congress carefully divided up regulatory power over the natural gas industry" specifying "the intended reach of

federal power." *Northwest Central Pipeline Corp. v. State Corp. Com'n of Kansas*, 489 U.S. 493, 510 (1989) (internal quotation marks and citation omitted). The Supreme Court summarized this division of authority in these terms:

> Section 1(b) conferred on federal authorities exclusive jurisdiction over the sale and transportation of natural gas in interstate commerce for resale, . . ., at the same time expressly reserving to the States the power to regulate, among other things the production or gathering of natural gas, that is, the physical acts of drawing gas from the earth and preparing it for the first stages of distribution.

*Id.* (internal quotation marks and citations omitted).

The NGA gives exclusive FERC "jurisdiction over the transportation of natural gas in interstate commerce. *Northwest Central Pipeline*, 489 U.S. at 506 (underlining added). "This jurisdiction encompasses regulation of market entry through FERC's [*i.e.*, 'permitting authority'] authority to issue certificates of public convenience and necessity authorizing pipelines to transport and sell gas in interstate commerce, . . ., and of market exit through FERC's control over [*i.e.*, 'abandonment authority'] the abandonment of certificated interstate service." *Id.* Thus, "[t]he NGA confers upon FERC *exclusive* jurisdiction over the *transportation* and sale of natural gas in interstate commerce for resale," and "FERC exercises *authority over* the rates and *facilities* of

17

natural gas companies *used in this transportation* and sale through a variety of powers." *Schneidewind*, 485 U.S. at 300-301 (italics added).

"The FERC has authority to regulate the construction, extension, operation, and acquisition of natural gas facilities, *see id.* § 717f(c)(1)(A), and does so through its extensive and detailed regulations concerning applications for certificates. *See generally* 18 C.F.R. Part 157, Subpart A." *Northern Natural Gas Co. v. Iowa Utilities Bd.*, 377 F.3d 817, 821 (8th Cir. 2004); *see also National Fuel Gas Supply Corp. v. Public Service Com'n of State of N.Y.*, 894 F.2d 571, 573 (2nd Cir.) ("FERC has promulgated detailed regulations concerning applications for such certificates and for orders permitting abandonment." (citations omitted)), *cert. denied*, 497 U.S. 1004 (1990). Specifically, Congress has required applicants in § 717f proceedings to certify to FERC "that it will design, install, inspect, test, construct, operate, replace, and maintain a gas pipeline facility under those standards and plans for inspection and maintenance under" the PSA. 49 U.S.C. § 60104(d)(2). Consistent with this legislation, FERC's regulations require an applicant to attach exhibits to its application for a certificate of public convenience and necessity that, in part, certify:

18

that it will design, install, inspect, test, construct, operate, replace, and maintain the facilities for which a certificate is requested in accordance with Federal safety standards and plans for maintenance and inspection or . . . that it has been granted a waiver of the requirements of the safety standards by the Department of Transportation in accordance with the provisions of section 3(e) of the Natural Gas Pipeline Safety Act of 1968.

18 C.F.R. § 157.14(a)(9)(vi).  In other words, as part of its permitting authority, FERC requires applicants to certify that in designing, installing, inspecting, testing, constructing, operating, replacing and maintaining natural gas  facilities, they will comply with federal "safety standards."[3]

Storage of gas in interstate commerce falls within the scope of transportation covered by the NGA, as the Supreme Court observed in *Schneidewind*:

Petitioners argued below that Storage was not a natural gas company within the meaning fo the NGA, contending that the storage of gas constitutes neither the transportation nor the sale of gas in interstate commerce.  Both courts below rejected this argument, 627 F. Supp. 923, 925-926 (W.D. Mich. 1985), and 801 F.2d 228, 230, n 3 (6th Cir. 1986), reasoning that "transportation" includes storage. "'Underground gas storage facilities are a necessary and integral part of the operation of piping gas from the area of production to the area of consumption.'"  *Ibid*., quoting *Columbia Gas Transmission Corp. v. Exclusive Gas Storage Easement*, 776 F.2d 125, 129 (6th Cir. 1985),

---

[3]"In conjunction with the FERC's review of a natural gas project application [pursuant to section 7 of the NGA], it must ensure that the project complies with the requirements of all relevant federal laws." *Islander East Pipeline Co., LLL v. Connecticut Dept. of Environmental Protection*, 482 F.3d 79, 84 (2nd Cir. 2006).

> and 578 F. Supp. 930, 933 (N.D. Ohio 1983).  We agree.
> Petitioners, in any event, do not press the point here.

485 U.S. at 295 n. 1; *see also B&J Oil and Gas v. F.E.R.C.*, 353 F.3d 71,

73 (D.C. Cir. 2004); *Columbia Gas Transmission Corp. v. An Exclusive*

*Natural Gas Storeage Easement in Clinton . . .*, 747 F. Supp. 401, 404

(N.D. Ohio 1990).   In that regard, FERC has issued specific regulations for

blanket certificates and authorization of underground storage field facilities.

*See, e.g.,* 18 C.F.R. § 157.213.

Because it is "now well settled:  Congress occupied the field of

matters relating to wholesale sales and <u>transportation</u> of natural gas in

interstate commerce," the central question is whether the Kansas Gas

Storage statutes and regulations are a regulation of the "<u>facilities</u> of natural

gas companies <u>used in transportation</u> and sale for resale of natural gas in

interstate commerce."  *Schneidewind*, 485 U.S. at 305-306 (underlining

added).  Because "every state statute has some indirect effect on . . .

facilities of natural gas companies," it is important to consider whether the

purpose of the state law "is to regulate matters Congress intended FERC to

regulate" and whether there is the "imminent possibility of collision

between" the state law and the NGA.  485 U.S. at 308-310.

On the face of it, there is little question that the Kansas Gas

Storage statute and the resulting regulations are directed at the "facilities" of the gas companies "used in transportation" and "amounts to a regulation of . . . facilities, a field occupied by federal regulation." *Schneidewind*, 485 U.S. at 306-307.  The Kansas Legislature authorized rules and regulations on "permitting, monitoring, . . . closure and abandonment of  . . . underground porosity storage of natural gas."  K.S.A. 55-1,115(a).  Accordingly, the KCC regulations specify, in part, that "[n]o underground porosity gas storage facility . . . in existence on or before July 1, 2002 shall continue in operation unless" it has filed for a provisional permit subject to submitting various information, testing results, development of a safety plan, and other reports.  K.A.R. 82-3-1002(a).  If the underground gas storage is operated in violation of this regulation, the KCC may impose daily $1,000 fines and "shut down" the  facility "until compliance is achieved."  K.A.R. 82-3-1002(i).   Before the provisional permit expires, such an operator must apply for an operating permit that demands, in part, additional evaluations, testing, reporting, safety systems, and well requirements. K.A.R. 82-34-1003.  Like a violation of the provisional permit, the KCC upon a violation of the operating permit may fine or shut down a facility "until compliance is achieved."  *Id.*  The KCC's regulations also

address other aspects of underground storage facilities, *inter alia*, testing and inspection of gas storage wells, storage facility monitoring and reporting, annual safety inspections, and abandonment of a storage facility.

These State efforts are plainly focused upon regulating a field exclusively occupied by FERC's permitting authority.  CIG has been issued a certificate of public convenience and necessity under the NGA authorizing it to acquire, construct, operate and maintain the Boehm Gas Field as an underground gas storage facility.  CIG's Boehm Gas field is one of FERC's "jurisdictional storage fields" listed on FERC's website.  The State aims to condition CIG's federally-granted authority to operate this underground storage facility upon compliance with the State's "permitting" requirements that are based, in turn, on State standards.  This is not an instance when a state's law has merely an indirect effect upon the facilities of a natural gas company.  In adding its own permitting procedures, standards and consequences, the State law's central purpose is to regulate the permitting of interstate transportation facilities.  As noted above, FERC exclusively exercises permitting and abandonment authority, and the State is seeking to exercise the same authority.  *See National Fuel Gas Supply Corp. v. Public Service Com'n of State of N.Y.*, 894 F.2d at 579.  Indeed,

the State's law and regulations seek to "control . . . facilities of natural gas companies, . . . precisely the thing[] over which FERC has comprehensive authority." *Schneidewind*, 485 U.S. at 308. In short, the State law here concerns matters "explicitly considered" by FERC and directly affecting a pre-empted area. *National Fuel Gas Supply Corp. v. Public Service Com'n of State of N.Y.*, 894 F.2d at 579

The defendants contend that Congress intended the NGA to empower FERC with exclusive authority over economic regulation, not safety regulation. Highlighting the factual setting in *Schneidewind* and certain other cases cited by the plaintiff, the defendants cast FERC's jurisdiction as "economic" in nature and concerned with wholesales of natural gas, rates and the financial positions of the interstate gas companies. They distinguish their "safety regulations . . . [as] not directed at controlling the 'rates and facilities' of CIG because they do not target either the natural gas prices charged by companies or the companies' financing decisions." (Dk. 21, p. 12). They also offer that the Kansas regulations concern inspections, monitoring, safety plans, and gas containment and address the safe operation of already authorized facilities and do not intrude into FERC's decision to authorize CIG's location and

23

construction of its storage facility at Boehm Field.  In the defendants'

judgment, Congress did not intend FERC to have exclusive jurisdiction

over safety regulation, for in the Pipeline Safety Act ("PSA")[4] it authorized

the Department of Transportation ("DOT") to set and enforce standards for

natural gas safety.  Finally, the defendants deny that underground natural

storage facilities come within the scope of the PSA and its express pre-

emption clause.  The court is not persuaded by these arguments for the

reasons that follow.

The defendants have read the pre-empted "field of matters

relating to wholesale sales and transportation of natural gas in interstate

---

[4]Enacted in 1994, the PSA essentially recodifies "without substantive change" the Natural Gas Pipeline Safety Act of 1968 ("NGPSA") and the Hazardous Liquids Pipeline Safety Act of 1979 ("HLPSA").  *Texas Midstream Gas Services, L.L.C. v. City of Grand Prairie*, 2008 WL 5000038 at *5 (N.D. Tex. Nov. 25, 2008) (citing generally Randy J. Sutton, Annotation, *Validity, Construction, and Application of Pipeline Safety Act, 49 U.S.C. §§ 60101 et. seq., and Other Acts Subsumed Therein*, 186 A.L.R. Fed. 361 (2003).  The stated purpose of the PSA "is to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation."  49 U.S.C. § 60102(a)(1).  The Secretary is to "prescribe minimum safety standards for pipeline transportation and for pipeline facilities" and these standards "may apply to the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities.  49 U.S.C. § 60102(a)(2).

commerce" and the "rates <u>and</u> facilities, a field occupied by federal regulation" from *Schneidewind*, 485 U.S at 305, 307 (underlining added), as a marriage of jurisdictional areas and then gave the coupled areas the same last name of "economic" regulation.  Such a reading falters under the accepted understanding of what the NGA designated as coming within exclusive federal jurisdiction:

> The NGA delineated specific areas of federal regulatory authority. Section 1(b) of the NGA gave the Commission plenary jurisdiction over three areas, and three areas only:  (1) the transportation of natural gas in interstate commerce, (2) the sale in interstate commerce of natural gas for resale, and (3) natural-gas companies engaged in such transportation or sale.

*Panhandle Eastern Pipeline Co.*, 83 F.3d at 1225.  Transportation of natural gas, including its storage, is one of the three areas over which FERC has plenary jurisdiction, and so is the company transporting the interstate natural gas.  Each area stands alone and does not depend on any relationship with another.  *See National Fuel Gas Supply Corp. v. Public Service Com'n of State of N.Y.*, 894 F.2d at 576 (state environmental review "is undeniably a regulation of a facility used in the interstate transportation of natural gas" and thus, is within FERC's exclusive authority as set forth in *Schneidewind*).

 The defendants cite no direct authority for the proposition that

25

FERC's plenary jurisdiction over transportation only extends to regulatory matters directly affecting the sales, rates, or financial decisions of the companies engaged in such transportation. They draw support largely from the predominant number of cases that do involve such regulatory efforts and, in particular, *Schneidewind*. What little traction that can be gained from such an argument slips away upon looking at other NGA and PSA cases that have pre-empted the safety and/or environmental regulations of state or local authorities. *See, e.g., Weaver's Cove Energy, LLL v. Rhode Island Coastal Resources Management Council*, 589 F.3d 458 (1st Cir. 2009) (state environmental regulations); *Northern Natural Gas Co. v. Iowa Utilities Bd.* 377 F.3d 817 (8th Cir. 2004) (state environmental regulations); *ANR Pipeline Co. v. Iowa State Commerce Com'n*, 828 F.2d 465 (8th Cir. 1987) (state statutes and regulations imposing safety and environmental standards); *Southern Union Co. v. Lynch*, 321 F. Supp. 2d 328 (D.R.I. 2004) (state licensing of certain natural gas pipefitters); *Northern Natural Gas Co. v. Munns*, 254 F. Supp. 2d 1103 (S.D. Iowa 2003) (state regulations on land restoration during and after interstate natural gas pipeline construction); *Algonquin LNG v. Loqa*, 79 F. Supp. 2d 49 (D.R.I. 2000) (local zoning ordinances and building codes).

The defendants maintain that Congress never intended FERC to have exclusive regulatory jurisdiction over the safety of interstate transportation as evidenced by the latter passage of the pipeline safety legislation that conferred regulatory authority upon DOT. While the passage of PSA resulted in some regulatory tension between the respective governmental bodies,[5] the court finds nothing from which to infer that the Congress intended to create anything other than a comprehensive federal regulatory scheme governing safety standards on interstate transportation of natural gas. First, the PSA expressly preserves a regulatory role for FERC. As discussed earlier, FERC evaluates and ensures that applicants for facility projects comply with relevant

---

[5] *See generally* Jim Behnke, *Safety Jurisdiction over Natural Gas Pipelines*, 19 Energy L.J. 71 (1998) ("That history is a tale of jurisdictional conflict and territoriality, with the FERC, the DOT and the several states at one time or another attempting to establish, expand or protect their respective authority to regulate the safety of natural gas pipelines relative to the other." [p.83] "Pipeline safety, then is one of the many issues that the FERC can and does address in a certificate proceeding under sections 1(b) and 7, and that can be the legitimate subjection of a section 7(e) condition. This is confirmed by the history of federal pipeline safety regulation that preceded enactment of the RPSA." [p. 83] "[T]he passage of the 1976 NGPSA Amendments failed, as a technical matter, to remove pipeline safety jurisdiction from the FPC under the NGA, and did not make exclusive the DOT's jurisdiction to establish federal safety standards over FERC Regulated NGA section 1(b) Facilities. At best, the FPC and the DOT were left by Congress to work out an allocation of jurisdictional responsibilities between themselves." [88-89]).

environmental and safety federal laws and regulations.  In the PSA,

Congress specifically required applicants in § 717f proceedings to certify to

FERC "that it will design, install, inspect, test, construct, operate, replace,

and maintain a gas pipeline facility under those standards and plans for

inspection and maintenance under" the PSA.  49 U.S.C. § 60104(d)(2).[6]

Additionally, the legislative history shows that Congress did not intend the

PSA to deprive FPC (later FERC) of safety jurisdiction in the application

process but to provide another regulatory agency to assist in creating and

enforcing safety standards:

> In addition, section 7 of the Safety Act provides that applicants under
> the Natural Gas Act for a certificate to construct a pipeline must
> certify that the proposed pipeline will meet Federal standards. This
> certification is binding on the FPC unless the DOT has timely advised
> the FPC that the applicant has violated DOT safety standards. The
> Senate Commerce Committee report on S. 1166 (Rept. 718, 90th
> Cong.) interprets this:
>> The FPC is required to consider and take action on some
>> elements of the safety of transmission proposals in acting on
>> applications for new or extended authority and it is not intended
>> that this act will diminish that authority and responsibility of the
>> FPC. * * * It is not intended by the committee that this process
>> of certification of compliance with the Secretary's standards will
>> bar FPC from continuing to consider safety in the same fashion

------

[6]One of the "important Congressional goals" behind this provision
was the "preservation of the concurrent safety jurisdiction of the FERC and
the DOT with respect to the FERC Regulated section 1(b) Facilities."  Jim
Behnke, *Safety Jurisdiction over Natural Gas Pipelines*, 19 Energy L.J. at
83.

> it presently does in connection with awarding certificates of public convenience and necessity.

The FPC agrees with this interpretation.

> Section 13(b) provides that, upon request, the Secretary shall furnish the FPC any information he has regarding the safety of materials, operations, devices or processes relating to the transportation of gas or the operation of pipeline facilities. This will allow the FPC to obtain the most up-to-date safety date to help in its consideration of the safety of proposed facilities for those aspects of the transportation of gas not covered by DOT standards.

H.R. Rep. 90-1390 (1968), P.L. 90-481, National Gas Pipeline Safety Act,

*reprinted in* 1968 U.S.C.C.A.N. 3223, 3266; *see also* S.Rep. 94-852

(1976), P.L. 94-477, Natural Gas Pipeline Safety Act Amendments of 1976,

*reprinted in* 1976 U.S.C.C.A.N. 4673, 4693.[7]

———————————————

[7]When amendments to the PSA were being considered in 1976 to eliminate FPC pipeline safety jurisdiction, the FPC chairman submitted to the Senate Committee on Commerce written comments that included:

> "As you know, the Federal Power Commission's mandate to engage in safety regulation is derived largely from the Natural Gas Act, as amended, 15 U.S.C. 717, et seq.

> Under the provisions of the Natural Gas Act no person may engage in the sale for resale or transportation of natural gas in interstate commerce without a certificate of public convenience and necessity issued by the FPC for the construction and operation of the facilities as are necessary for the effectuation of such sale or transportation. . .  It is the public convenience and necessity standard of Sec. 7(c) and the public interest standard of Sec. 3 which have been held to authorize the Commission to impose safety standards on the transportation of natural gas. Under these statutory provisions the Federal Power Commission has long exercised its authority over pipeline safety and conditioned the grant of certificates upon the applicant's compliance with certain safety requirements.

> . . . . Safety aspects are evaluated during all phases of any

proposal: construction, operation (including transportation, unloading, storage and regasification), and routine and emergency maintenance.

In 1968, Congress enacted the Natural Gas Pipeline Safety Act, 49 U.S.C. 1671, et seq., which requires the Department of Transportation, acting through the Office of Pipeline Safety (OPS), to establish minimum federal safety standards for the transportation of natural gas and for the safety of pipeline and appurtenant facilities used in such transportation in interstate and intrastate commerce. Section 3(b) of the Safety Act directs the Secretary of Transportation to establish minimum Federal safety standards applicable to the 'design, installation, inspection, testing, construction, extension, operation, replacement and maintenance of pipeline facilities. ' Since the passage of the Pipeline Safety Act the Federal Power Commission has made its own independent safety reviews in order to decide what additional safety conditions should be prescribed in addition to those required by DOT.

There is no indication in the Pipeline Safety Act itself or in its legislative history that Congress, by enacting the Natural Gas Pipeline Safety Act intended to curtail the jurisdiction exercised by the Federal Power Commission in the field of pipeline safety. On the contrary, the legislative history of the Natural Gas Pipeline Safety Act is clear in illustrating that the intent of Congress, under enactment of the Safety Act, as that the Commission has retained authority to implement, in jurisdictional proceedings, safety standards of a more stringent nature than those standards promulgated by OPS:

> The general scheme of the act is to provide broad safety powers to the Secretary in gas pipeline transportation. The Federal Power Commission presently has certain safety regulatory authority over interstate transmission lines under the Natural Gas Act. The FPC is required to consider and take action on some elements of the safety of transmission proposals in acting on applications for new or extended authority and it is not intended that this act will diminish the authority and responsibility of the FPC. In order, however, that the FPC not be placed in the position of having to determine whether the construction and operation details of a proposed service conform to the Secretary's standards, an applicant may

Consistent with that history, courts have discerned

congressional intent on pre-emption of interstate natural gas transportation

by considering the NGA and the PSA concurrently, as complementing and

not opposing each other:

> Congress has exercised its Constitutional authority by enacting the NGA and the NGPSA.  These statutes, together with the regulations promulgated pursuant to them, establish a comprehensive scheme of federal regulation that the Supreme Court has said confers upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce. . . .
> That regulatory scheme governs virtually every aspect of the transportation and sale of natural gas.  It includes provisions for determining the price at which natural gas may be sold, whether natural gas facilities may be built or modified, where they may be located, the methods by which they are constructed, and the safety standards that must be observed.

*Algonquin LNG v. Loqa*, 79 F. Supp. 2d at 51 (citations omitted); *see, e.g.*,

*Southern Union Co. v. Lynch*, 321 F. Supp. 2d at 338; *Northern Natural*

*Gas Co. v. Munns*, 254 F. Supp. 2d at 1108.  As the defendants have cited

from FERC's website, the agencies are cooperating in the exercise of

---

certify to this effect and the certification will be conclusive on FPC. . . .

S. Rep. 94-852, *reprinted in* 1976 U.S.C.C.A.N. at 4693-94.  As quoted earlier, the 1976 amendments to the PSA did not "remove pipeline safety jurisdiction from the FPC under the NGA, and did not make exclusive the DOT's jurisdiction to establish federal safety standards over FERC Regulated NGA section 1(b) Facilities."  Jim Behnke, *Safety Jurisdiction over Natural Gas Pipelines*, 19 Energy L.J. at 88.

complementary jurisdiction in order to fulfill congressional intent for this

broad federal regulatory scheme:

> **Safety & Inspections**
> Once Natural Gas pipeline projects become operational, safety is
> regulated, monitored and enforced by the Department of
> Transportation. To report safety problems on pipelines, please visit
> the Department of Transportation's Office of Pipeline Safety.

http://www.ferc.gov/industries/gas/safety.asp. (visited on 3/27/2010).[8]  In

short, there is nothing to indicate that Congress passed PSA because it

believed that FERC lacked jurisdiction to regulate the safety of interstate

transportation or that Congress later intended to deny FERC of that safety

jurisdiction.  And what has transpired apparently under the PSA is that

FERC and DOT have created a comprehensive scheme of safety

regulation with FERC exercising its authority during the application,

_____

[8]FERC's brochure on the Blanket Certificate Program: Notice to
Landowners published in June 2007 addresses, in part, underground
storage fields and includes the following paragraph in its discussion of
"Safety Issues:"
> "While the Commission has oversight responsibility to ensure that
> natural gas facilities are safely constructed and installed, once the
> new facilities go into service, the U.S. Department of Transportation
> (DOT) takes over the responsibility for ensuring the safe operation for
> the lifetime of the facilities.  DOT also is responsible for setting the
> federal safety standards for natural gas facilities as well as other
> types of energy facilities."
http://www.ferc.gov/for-citizens/citizen-guides.asp (last visited on March 31,
2010).

approval, and construction process and then deferring to DOT for monitoring and enforcing once the facilities become operational. The court fails to see how this calls into doubt Congress's intent to pre-empt states from exercising permitting or abandonment authority so as to impose and enforce additional safety regulations directly on facilities used in the interstate transportation of natural gas.

In that respect, the defendants also propose that the terms of PSA do not show a clear and manifest intent by Congress to pre-empt states from imposing safety regulations on underground storage facilities. This argument finds little support in the plain and unambiguous terms of the PSA. Explicit in the PSA is Congress's stated intent to pre-empt state safety standards:

> **(c) Preemption.**--A State authority that has submitted a current certification under section 60105(a) of this title may adopt additional or more stringent safety standards for intrastate pipeline facilities and intrastate pipeline transportation only if those standards are compatible with the minimum standards prescribed under this chapter. <u>A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation</u>. . . .

49 U.S.C. § 60104(c) (underlining added).[9] The parties stipulate that the

---

[9]Neither party refers to the two exceptions to this pre-emption provision or argues for their applicability here. *See Olympic Pipe LIne Co. v. City of Seattle*, 437 F.3d 872, 878 (9th Cir. 2006).

Kansas Gas Storage Statute directed the KCC to adopt regulations for protecting and ensuring public safety from underground storage of natural gas in Kansas. Thus, if CIG's storage field in Kansas meets the definition of an interstate pipeline facility or interstate pipeline transportation, then the Kansas statute and regulations are pre-empted by the PSA.

Under the PSA, "'pipeline facility' means a gas pipeline facility," 29 U.S.C. § 60101(a)(18), and "'pipeline transportation' means transporting gas," 29 U.S.C. § 60101(a)(19). A "'gas pipeline facility' includes a pipeline, a right of way, a facility, a building, or equipment used in transporting gas or treating gas during its transportation." 29 U.S.C. § 60101(a)(3). An "'interstate gas pipeline facility' means a gas pipeline facility--(A) used to transport gas; and (B) subject to the jurisdiction of the Commission under the Natural Gas Act (15 U.S.C. 717 et seq.)." 29 U.S.C. § 60101(a)(6). Finally, "'transporting gas' (A) means the gathering, transmission, or distribution of gas by pipeline, or the storage of gas, interstate or foreign commerce . . . ." 29 U.S.C. § 60101(a)(21). By the plain terms of the statute, CIG's storage field in Kansas meets the definition of an interstate gas pipeline facility, because it is subject to FERC jurisdiction and because it is used to store gas which is one of the

statutorily defined ways of transporting gas.

The defendants key on the term, "facility," and attempt to create an ambiguity from the PSA's failure to define this term by itself. The defendants proffer that "facility" should be defined as something "man-made" to the exclusion of some naturally-occurring geologic strata.[10] The court does not accept the defendant's proposition that this is a commonsense definition of "facility."[11] When read together, the dictionary

_____

[10]Though not cited by the defendants, there is a recent decision that indirectly supports their unique definition of "facility." *Petco Petroleum Corp. v. Natural Gas Pipeline Co. of America*, 410 F. Supp. 2d 715, 720-21 (S.D. Ill. 2006). This court found that "some dictionaries" include an "element of creation" in the definition of "facility" and then concluded that "underground storage fields would not be 'facilities' because they were not created for storage in the way that a metal tank is created for storage." 410 F. Supp. 2d at 720. While the KCC here also focuses on an element of creation, it emphasizes who is the creator, and the *Petco* court emphasizes whether the storage device was first created for that purpose. Both are strained efforts to read an unnecessary element into an otherwise simple definition for "facility," that is, something serving or having the means to meet a particular purpose. The court rejects both as not offering any reasonable basis for finding an ambiguity in the use of "facility." Even assuming one could read some element of creation into "facility," the court still would find that an underground storage field is a "facility" in that the vacant geologic formation was recreated or modified by wells, lines, and compression equipment so as to serve as something that can store natural gas for subsequent use.

[11]As the plaintiff points out, the Kansas Gas Storage regulations are replete with instances of using "facility" in connection with the underground storage fields. *See, e.g.,* K.A.R. 82-3-1001, 1002, 1003, 1004, 1005, 1006, 1007, 1008, 1009, 1011, and 1012 ("underground porosity gas storage

references cited by the defendants do not emphasize how a facility is created but that the facility serves a particular purpose or meets the requirements for providing that service. A "facility" is "the physical means or equipment required for doing something, or the service provided by this: freq. with modifying word, as educational facilities, postal facilities, retail facilities, etc." *Oxford English Dictionary (online)* (2010). The question is whether an underground storage field would come within this ordinary and accepted meaning of "facility," as that term is used in the PSA.

The PSA defines an "interstate gas pipeline facility" as a facility "used to transport gas." 29 U.S.C. § 60101(a)(6). Giving this term its ordinary meaning from its established context,[12] a "facility" under the PSA is the means, equipment, place or something that serves the particular purpose of or meets the requirements for "transporting gas." The PSA includes "storage of gas" within the defined meaning of "transporting gas." 29 U.S.C. § 60101(a)(21). Thus, an underground storage field used to store natural gas comes within the definition of an "interstate gas pipeline

_____

facility," "storage facility," and "facility").

[12]*See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.")

facility."[13]

The defendants' next challenge is that the PSA does not define "storage" and that the terms of the PSA do not indicate a congressional intent to include underground storage. The defendants offer nothing to question the plain meaning of "storage." "We must assume that the ordinary meaning of the words Congress uses conveys its intent." *United Keetoowah Band of Cherokee Indians of Okla. v. U.S. Dep't of Hous. & Urban Dev.*, 567 F.3d 1235, 1241 (10th Cir. 2009). The defendants summarily assert that the Congress did not intend "underground" fields to be within the meaning of "storage" as evidenced by the lack of regulations

---

[13]Even though "facility" is not defined by the PSA, its accepted meaning in this area of the law and in this field of industry shows its consistent use in connection with underground storage. *See, e.g.*, *In re Columbia Gas System Inc.*, 50 F.3d 233, 235 (3rd Cir. 1995) 9 "underground storage facilities"); *Northern Natural Gas Co. v. L.D. Drilling, Inc.*, 618 F.Supp.2d 1280, 1291 (D.Kan. 2009) ("underground storage facility"); *Northern Natural Gas Co. v. Martin, Pringle, Oliver, Wallace & Bauer, L.L.P.*, 289 Kan. 777, 786, 217 P.3d 966, 973 (2009) ("underground storage facilities"); 18 C.F.R. § 157.213 (2009) (FERC regulations using "underground storage facility"); 26 C.F.R. § 1.263A-1 (2007) (IRS regulations using "underground storage facility"); Docket No. CP09-418-000, 130 FERC P 61065, 2010 WL 286465 (Jan. 26, 2010)(Commission's order issuing a certificate of public convenience and necessity on an underground "gas storage facility"). Additionally, the plaintiff attaches a 2000 letter from DOT's Pipeline and Hazardous Materials Safety Administration that referred to this particular underground storage field as the "Boehm storage facilities." 2000 WL 35501219; (Dk. 22-2, Ex. B).

specific to the fields and storage wells.  The court rejects this untenable

argument.  Natural gas "is most commonly held in inventory underground

under pressure in three types of facilities."  U.S. Energy Information

Administration, *The Basics of Underground Natural Gas Storage*, p. 1 (Aug.

2004)

(http://www.eia.doe.gov/pub/oil_gas/natural_gas/analysis_publications/stor

agebasics/storagebasics.html) (last visited March 30, 2010); *See*  FERC

Citizen's Guide, "An Interstate Natural Gas Facility on My Land," (Apr.

2009) (available at http://www.ferc.gov/for-citizens/citizen-guides.asp

visited on Mar. 29, 2010) ("Most storage of natural gas takes advantage of

natural geologic formations (reservoirs).  There are three types of

underground storage fields . . . .")   "The use of underground natural gas

facilities is almost as old as the development of long distance transmission

lines."  FERC website, *Natural Gas Storage--Background*

(http://www.ferc.gov/industries/gas/indus-act/storage/background.asp)

(visited on Mar. 30, 2010); *cf. Columbia Gas Transmission Corp. v. An

Exclusive Gas Storage Easement*, 578 F. Supp. 930, 934 (D. Ohio 1983)

("Underground storage facilities are "necessary for the proper operation" of

a gas pipeline. The Natural Gas Pipeline Safety Act of 1968 (49 U.S.C. §

1671) recognizes storage is an element of transportation of gas. . . .

Underground storage facilities are a necessary and integral part of the

operation of a natural gas pipeline."), *aff'd*, 776 F.2d 125 (6th Cir. 1985).

The court views it as unreasonable to infer in the absence of plainer

language that Congress did not intend the term, "storage," to include one of

the oldest, more important, and most common methods of natural gas

storage.[14]  The plaintiff also points to DOT's website, under Pipeline Safety

Community, in particular, PHMSA Form 12, for "Gas Storage Field Review"

and attaches this form to its reply brief.

http://www.phmsa.dot.gov/pipeline/library/forms (link to specific form

available here at last visit on March 30, 2010).  The form evidences DOT's

efforts to regulate the operations of underground storage facilities as part of

its authority under the PSA.  The defendants come forward with no

reasonable basis for interpreting "storage" under the PSA so narrowly as to

_____

[14]The plaintiff attaches as an exhibit to its reply brief a letter from
DOT's Office of Pipeline Safety dated August 8, 2000, that states in
relevant part:
> "On July 26 through September 8, 1999, a representative of the
> Southwest Region, Office of Pipeline Safety, inspected your interstate
> pipeline facilities from your Campo Junction, Colorado to Amarillo,
> Texas and from your Campo Junction to Mocane, Oklahoma,
> including your Flank and Boehm storage facilities.
2000 WL 35501219, p. 1 (underlining added).

exclude underground storage facilities. The court finds it plain and unmistakable that Congress intended the ongoing regulation of natural gas storage under the PSA.

The defendants offer that Kansas's safety regulations are compatible with the purpose of the PSA and do not actually conflict with DOT's regulatory oversight. On the latter point, the defendants cite an Advisory Bulletin issued by DOT's Research and Special Programs Administration in July of 1997 that included the following statement: "And at this time, we urge operators of underground storage facilities that serve interstate gas or hazardous liquid pipelines to comply not only with the IOGCC [Interstate Oil and Gas Compact Commission] and API [American Petroleum Institute] documents but also with the appropriate state underground storage regulations to the extent feasible." 62 Fed. Reg. 37-118-01, 1997 WL 376703. The defendants overstate the Advisory Bulletin as DOT's agreement "with the view that the States can and should regulate in this area." (Dk. 21, p. 20). The Bulletin, instead, simply "urges" underground storage operators to comply voluntarily with standards set by the non-governmental entities, IOGCC and API, but also with, "to the extent feasible," those state underground regulations deemed to be "appropriate."

The Bulletin advises operators of interstate underground storage facilities of their discretion to follow these other standards and urges them to do so but lets them decide upon feasibility and appropriateness. The court does not construe the Bulletin as saying that DOT recognizes states as having the legal authority or principal responsibility to regulate interstate underground storage facilities.[15]

Emphasizing that the Kansas regulations principally serve to ensure safe containment of gas within geologic formations, the defendants see a compatible division of regulatory authority with the federal agencies focusing on pipeline safety but stopping short of Kansas's regulatory aim of safe gas containment underground. The defendants then deny any actual conflict and ask the court to see their regulatory efforts as only

_____

[15]Similarly, when FERC issues a certificate of public convenience and necessity authorizing an underground natural gas storage facility, it may include the following in its order:

"Any state or local permits issued with respect to the jurisdictional facilities authorized here must be consistent with the conditions of this certificate. The Commission encourages cooperation between interstate pipelines and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction, abandonment, or operation of facilities approved by this Commission."

Docket No. CP09-418-000, 130 FERC P 61065, 2010 WL 286465 at *14 (Jan. 26, 2010).

supplementary.  This argument does not prevail.

Considering that the "purpose" of the PSA is "to provide adequate protection against the risks to life and property posed by pipeline transportation and pipeline facilities," 49 U.S.C. § 60102(a)(1), the PSA expressly pre-empts all state "safety standards" imposed for the purpose of addressing these risks.  Courts have construed the statutory text and legislative history behind the PSA as leaving no room for state regulation of interstate state pipeline safety issues:

> The portions of the legislative history quoted above make clear that Congress intended to preclude states from regulating in any manner whatsoever with respect to the safety of interstate transmission facilities.  We agree with the conclusion reached by the District Court, and by the courts in *Natural Gas Pipeline* [*Natural Gas Pipeline Co. of America v. Railroad Commission*, 679 F.2d 51 (5th Cir. 1982)] and *Terrebonne Parish* [*United Gas Pipeline Co. v. Terrebonne Parish Police Jury*, 319 F. Supp.  1138 (E.D. La. 1970), *aff'd,* 445 F.2d 301 (5th Cir. 1971)], that the NGPSA leaves nothing to the states in terms of substantive safety regulation of interstate pipelines, regardless of whether the local regulation is more restrictive, less restrictive or identical to the federal standards.

*ANR Pipeline Co. v. Iowa State Commerce Com'n*, 828 F.2d 465, 469 (8th Cir. 1987); *see also Southern Union Co. v. Lynch*, 321 F. Supp. 2d at 338; *Northern Border Pipeline Co. v. Jackson County, Minn.*, 512 F. Supp. 1261, 1265 (D. Minn. 1981).  Congress in passing the PSA with the express pre-emption clause rejected the notion "'that gas safety matters are primarily of

local concern and subject to regulation by the States.'"  *Northern Border Pipeline Co.*, 512 F. Supp. at 1265 (quoting H.R. Rep. No. 1390 (1968) *reprinted in* 1968 U.S.C.C.A.N. 3223, 3245).  The question is not whether an actual conflict exists, but whether the substance and scope of Congress's displacement of state law reach the state laws in question here, and it does.  That the defendants believe their regulatory efforts fill a gap and focus principally on the safe containment of gas stored underground does not change the result:

> The decision of the Department of Transportation to exempt certain pipelines from federal regulation does not necessarily mean that the state can step in and impose its own regulations.  "[A] federal decision to forego regulation in a given area may imply an authoritative federal determination that the area is best left unregulated, and in that event would have as much pre-emptive force as a decision to regulate." *Arkansas Electric Cooperative Corp. v. Arkansas Public Service Comm'n*, 461 U.S. 375, 384 (1983); *see Lipscomb v. Transac, Inc.*, 749 F. Supp. 1128, 1131 (M.D. Ga.1990) (ERISA preemption of state law claims).  Here, Congress granted exclusive authority to regulate the safety of construction and operation of interstate hazardous liquid pipelines to the Secretary of the Department of Transportation.  This Congressional grant of exclusive federal regulatory authority precludes state decision-making in this area altogether and leaves no regulatory room for the state to either establish its own safety standards or supplement the federal safety standards.  *ANR*, 828 F.2d at 472; *see Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n*, 461 U.S. 190, 212 (1983).

*Kinley Corp. v. Iowa Utilities Bd., Utilities Div., Dept. of Commerce*, 999

F.2d 354, 359 (8th Cir. 1993). Congress has granted exclusive federal authority to regulate the safety of interstate natural gas facilities, and the state is precluded from claiming any authority to establish and enforce its own safety standards, whether supplemental or not. Finally, as has been already discussed above, there is no basis in the statutory text or legislative history for the defendants to read out underground storage facilities from the encompassing plain terms of the PSA.

As far as applying the implied pre-emption principles, it is appropriate to take a closer look at "the imminent possibility of collision" between the state laws and regulations and the NGA in deciding whether Congress has occupied this field. *Schneidewind*, 485 U.S. at 310. Following what other courts have done with this factor, the court concludes that the state regulation here is not compatible but would interfere with the federal regulatory scheme and would compromise the federal agencies' ability to achieve a comprehensive and uniform scheme. The exclusive permitting authority of FERC exercised here collides with the KCC's exercise of its permitting authority under these state safety standards. "It is settled that if the NGA grants jurisdiction to the Commission over a matter, as it does here, its jurisdiction is exclusive." *Cascade Natural Gas Corp. v.*

*F.E.R.C.*, 955 F.2d 1412, 1421 (10th Cir. 1992) (citations omitted).  The

State's enforcement of its safety standards through permits, fines and

administrative actions presents the real possibility of a disagreement over

the safety of the facilities and over what measures are appropriate and

necessary to address any safety concerns.  A "state-ordered" change in the

operation of the interstate natural gas facility "would impinge on the federal"

permitting authority.[16]  *See Schneidewind*, 485 U.S. at 310.  The State's

exercise of concurrent review and enforcement authority of different safety

standards would likely burden, frustrate and delay the operation, any

extensions, and/or eventual abandonment of the storage facility.  *See Nat'l*

*Fuel Gas Supply Corp. v. Pub. Serv. Com'n*, 894 F.2d at 576-77; *Michigan*

*Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co.*, 887 F.2d at

1301; *Northern Natural Gas Co. v. Munns*, 254 F. Supp. 2d at 1110 -12.

This is made all the more likely since the defendants differentiate their

standards as more complete and extensive than anything currently used or

contemplated by the federal authorities.

---

[16]FERC's certificate authorizing CIG to construct and operate the
storage facility is abridged if CIG's construction and operation under the
federal certificate would depend also upon obtaining state permits issued
only after meeting state standards.  In mandating and enforcing compliance
with the state standards, the defendants have overstepped their authority
and their efforts must be pre-empted.

The refrain to each of the defendants' arguments is "the heavy presumption against preemption in the area of state safety regulation" and the State's overriding interest in protecting life and property through a comprehensive regulatory scheme addressing safe gas containment. This presumption, however, "is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. at 108. This situation is not an instance of a state's exercise of historic police powers with a mere indirect effect upon interstate natural gas transportation. Rather, the defendants here are actually exercising direct permitting and abandoning authority over interstate natural gas transportation. Prior to the NGA, the states were "powerless to regulate" in this area by reason of the Supreme Court decisions. *Cascade Natural Gas Corp. v. FERC*, 955 F.3d at 1416.[17] Thus, despite their insistence to the contrary, the defendants are not in a

---

[17]"In the natural gas industry, section 1(b) of the NGA created a field of exclusive federal regulation and a field of regulation reserved to the states. As this paper has previously discussed, with the exception of section 1(c) of the NGA, the Hinshaw Amendment, the field of exclusive federal regulation under the NGA is roughly the same field the Supreme Court determined the states were forbidden to regulate under the 'dormant' Commerce Clause during the first three decades of this century." Jim Behnke, *Safety Jurisdiction over Natural Gas Pipelines*, 19 Energy L.J. at 91.

position to claim the benefit of a presumption against pre-emption in the exercise of this direct authority over interstate transportation of natural gas.

The court concludes that the Kansas statutes and regulations cited above and the efforts to enforce the same are clearly pre-empted by both the NGA and the PSA. More specifically, the Kansas enabling statutes purport to give the KCC the authority for permitting and abandoning storage facilities of interstate natural gas transportation companies like CIG, and this statute and the regulations promulgated in the exercise of that authority are impliedly pre-empted by the NGA. In addition, the Kansas statute and regulations setting forth and enforcing safety standards on CIG's underground storage facility, which is an interstate natural gas pipeline facility, are expressly pre-empted by the PSA. Thus, the court finds that the Kansas Gas Storage Statutes, K.S.A. §§ 55-1,115 and 55-182(a), and the Kansas Gas Storage Regulations, §§ 82-3-105, 82-3-113, 82-3-114, 82-3-117, 82-3-120, and 82-3-1000 through 82-3-1012, violate the Supremacy Clause, are pre-empted by the NGA and the PSA, and have no force or effect on the plaintiff's interstate natural gas pipeline, storage facilities and transportation at CIG's Boehm Underground Gas Storage Field. The court will grant this declaratory relief sought in the

47

plaintiff's complaint and advocated in the plaintiff's summary judgment pleadings. Because the plaintiff's brief fails to address and establish the present need for injunctive relief, the court will not grant the same at this time, but the plaintiff will be permitted to renew this request should declaratory relief later prove to be an inadequate remedy.

IT IS THEREFORE ORDERED that the plaintiff's motion for summary judgment (Dk. 19) is granted, and the defendants' cross-motion for summary judgment (Dk. 23) is denied;

IT IS FURTHER ORDERED that the Kansas Gas Storage Statutes, K.S.A. §§ 55-1,115 and 55-182(a), and the Kansas Gas Storage Regulations, §§ 82-3-105, 82-3-113, 82-3-114, 82-3-117, 82-3-120, and 82-3-1000 through 82-3-1012, are found to violate the Supremacy Clause, to be pre-empted by the NGA and the PSA, and to have no force or effect on the plaintiff's interstate natural gas pipeline, storage facilities and transportation at CIG's Boehm Underground Gas Storage Field;

IT IS FURTHER ORDERED that the clerk of the court shall enter this declaratory judgment for the plaintiff and against the defendants, with costs taxed to the defendant. Because the plaintiff's brief fails to address and establish the present need for injunctive relief, the court will

not grant the same at this time, but the plaintiff will be permitted to renew this request should declaratory relief later prove to be an inadequate remedy.

Dated this 13th day of April, 2010, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge